[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case case to this court as a limited contested dissolution of marriage. The plaintiff (hereinafter called the "husband") and the defendant (hereinafter called the "wife") were married in Bridgeport, Connecticut, on August 24, 1974. The wife's maiden name was Panchura. The plaintiff has resided continuously in the State of Connecticut for at least one year before the date of the filing of the complaint, and in fact, both of the parties have lived for a substantial period of time in Connecticut.
The parties have two minor children of their marriage, to wit: David John Kozlowski born March 11, 1976, and James Daniel Kozlowski born June 14, 1979. No other minor children have been born to the wife since the date of the marriage. The State of Connecticut is not contributing to the support or maintenance of the parties hereto.
The wife is a registered nurse. She has worked throughout the marriage. Some part of the marriage she worked full time and some part of the marriage she worked part time, but from 1986 through the present, she has worked full time. In 1987 she earned gross $26,814.00. In 1988 she earned gross $31,268.00. In 1989 she earned gross $37,265.00. In 1990 she CT Page 1398 earned gross $42,003.00. In 1991 through September 26 her payroll records indicate that she earned $38,060.00. Her current hourly pay is $21.61 per hour and she earns gross $864.40 per week.
The wife's pension provides that at normal retirement she will receive $665.50 per month. Her ratings at the Jewish Home for the Elderly, where she is presently employed, finds her to be an excellent performer and a dedicated nurse. She is the head nurse on Bennett Four which is the most physically disabled floor. This floor calls for the most skilled nurses to be there.
The husband graduated from Sacred Heart University in 1973 with a Bachelor of Arts degree in management. He went to work for U.S. Baird Corporation on April 15, 1974, and has worked there continuously ever since. He started with a pay at $143.00 per week as a planner. His job presently has him in charge of inventory at that company. His gross earnings from U.S. Baird Corporation are $711.20. In addition, he earns from Morko, Inc. $152.31 per week which is the earnings received by him from the delivery of the Bridgeport Post.
The parties were able to carry on life's activities and accumulate assets and live a decent lifestyle by both of the parties working throughout the marriage. They were able to accommodate each other to the extent that the husband worked days and the wife worked the evening shift. She worked generally approximately from 3:00 p.m. to 11:00 p.m. and he worked from 9:00 a.m. to 5:00 p.m. The wife would drop the children at her mother's home and the husband would pick them up on the way home and take care of them in the evening while she had taken care of them during the day. They both shared parenting responsibilities.
While it is obvious that this kind of a relationship put a strain on the marriage, it is also clear that the parties did this for a substantial period of time without incident. The wife, when she got home at 11:00 p.m., would stay up for a little while, do some chores and read and unwind and go to bed. The husband was already asleep since he was getting up at 5:00 in the morning.
In 1986 a woman became an inventory clerk at U.S. Baird. Initially, the husband and she were friends. Now they have an intimate relationship since early 1990. The wife told in graphic detail the incident that took place on June 16, 1991, when the husband told her that there was another woman, that he was committing adultery, planned remarriage, planning another family, and that it would be good because his present children CT Page 1399 would have half sisters and half brothers.
The wife indicated she felt horrible when told this, devastated, betrayed, dirty and used. The wife is age 40, the other woman is approximately 31 years of age. Presently. the wife has exclusive occupancy of the marital premises at 694 Thorme Street, Bridgeport, Connecticut, with her children. In his living there.
The wife indicated she felt horrible when told this, devastated, betrayed, dirty and used. The wife is age 40, the other woman is approximately 31 years of age. Presently, the wife has exclusive occupancy of the marital premises at 694 Thorme Street, Bridgeport, Connecticut, with her children. In addition, the husband's father lives in the marital home with the wife and pays $200.00 a month towards his support which the wife testifies is "break even" based on the expense involved in his living there.
The children attend private school, the oldest attends Notre Dame and the youngest attends St. Theresa. The total tuition for the two schools is $5,450.00. James is in the 7th grade at St. Theresa and the oldest son, David, is a sophomore at Notre Dame. The son James has an attention deficit diagnosed in the fourth grade three years ago. He was referred to a neurologist. He is presently on the drug Ritalin.
Both of the parties' health seems to be good although the wife complains about arthritis in her neck that radiates into her shoulder and arms. She said she takes a lot of Tylenol and aspirin, has some pain in her right hip and right buttocks. She sees Dr. Mary Myers every four months. Despite these problems, she has held down a job on a regular basis.
The wife testified that her nursing career had no part in her marriage breakup. She says the husband broke down the marriage with his affair. The husband says that the wife was a good mother and good nurse but that she was not a good wife and that the marriage began to breakdown in 1976. He claims the relationship with the other woman was not a cause of the breakdown.
Based on the testimony of the witnesses and comparing their credibility, the court finds that the relationship with the other woman was the cause of the breakdown of the marriage.
The husband started a business known as Morko, Inc. In that company he is an officer. He put into the business in 1990 (there is conflicting testimony as to approximately when it was all done but it appears to have occurred between January, CT Page 1400 1990, when most of the money was advanced, and August of 1990, when the last of the money was advanced) the total sum of approximately $64,000.00. That money came from the following sources:
1. $10,000.00 from the credit union;
2. $5,000.00 from the credit union accounts in the sons' (both sons) names;
3. $35,000.00 home equity loan from People's;
4. $6,000.00 CD from the husband's father's money withdrawn in approximately June of 1990;
5. $3,000.00 CD joint with the wife;
6. $5,000.00 loan, unsecured, with both husband and wife that.
The husband's testimony is that he consulted with the wife on the investment and she agreed. The wife said she was never asked. She was told about the deal and went along with his desires. The court finds the wife's testimony to be the more credible.
Today Morko is not an asset but a liability. The second mortgage on the house was raised from $25,000.00 to $60,000.00 to start up Morko, Inc. which did business as Pak Mail.
Substantial debt is owed as a result of the Morko investment. By stipulation of the parties, it was brought to the court's attention that the $18,000.00 debt to the landlord was removed from the husband's affidavit. (See January 31, 1992 letter in file.) It is also clear that during the course of the relationship between the husband and the other woman sums were spent for hotel rooms and otherwise in order to allow him to carry on this relationship. In fact, on his financial affidavit, the husband shows that he is helping Susan Manganello pay her rent in the sum of $152.31 per week.
The husband must first support his current family. Presently, the wife is not making ends meet, and she is in arrears on both the first and the second mortgage.
The court finds it has jurisdiction. The court has listened to the parties and listened to their witnesses and reviewed all the exhibits in the case. In addition, the court has taken into consideration all the criteria set forth in CT Page 1401 Connecticut General Statutes 46b-81, the assignment of property and transfer of title statute, 46b-82, the alimony statute, 46b-62, the attorney's fees statute, 46b-84, the child support statute and the child support guidelines, and all other relevant statutes. In addition, the court has reviewed the financial affidavits of the parties and listened to the arguments of counsel. Accordingly, the court orders as follows:
1. The marriage is dissolved on the grounds of irretrievable breakdown.
2. The husband shall pay, during his lifetime, to the wife the sum of $1.00 per year alimony as long as she has not remarried.
3. The husband shall quitclaim to the wife all his right, title and interest in the family homestead located at 694 Thorme Street, Bridgeport, Connecticut, subject to the first mortgage with People's Bank. Said mortgage is currently in arrears. The husband shall make that mortgage current within thirty (30) days of the date hereof.
 The second mortgage, referred to as the equity loan, which is in the principal sum of approximately $60,800.00 shall be the obligation of the husband. The husband shall make that mortgage current within thirty (30) days of the date hereof. The husband shall be obligated to pay the payments on this mortgage to People's Savings Bank. This mortgage is the approximate sum of the family assets which were put into Morko, Inc. which is currently valueless.
 In the event the wife sells the property prior to the husband having finally paid off the second mortgage, the husband will be obligated to pay these funds to the wife thereafter, and the payment to the wife will be taxable to her and tax deductible to the husband.
4. The contents of the family homestead will be the wife's except that the treadle sewing machine, cedar chest and low chest, which previously belonged to the husband's mother, shall belong to the husband.
5. Each party will retain the vehicle registered in his or her name, and each will be responsible for any loan balance on his or her vehicle.
6. The husband's retirement pension at U.S. Baird, which was accumulated during the course of the marriage, will be transferred one half to the wife by virtue of a Qualified Domestic Relations Order. Said transfer shall be of the CT Page 1402 present value of the pension as well as the survivor annuitant's benefit.
7. The husband shall be responsible for all the bills listed on his financial affidavit as well as the following:
a. Sears' bill of approximately $800.00;
b. Caldors' bill of approximately $800.00;
c. J. C. Penny's bill of approximately $150.00;
d. City Trust Master Card of approximately $1,700.00.
 The wife shall have no claim to the husband's business, Morko, Inc.
 The husband shall retain the 58 shares of People's Savings Bank stock.
10. Custody of the minor children has been stipulated to be with the wife. The husband shall have reasonable rights of visitation which he will work out directly with the children and he will thereafter advise the wife of the plans. The wife will consult with the husband on all major decisions pertaining to the education and health of the children. The wife will instruct the school to send directly to the husband copies of all the children's report cards and activities. However, the ultimate decision in all areas concerning the children will be wife's.
11. The husband will pay to the wife total child support in the amount of $262.00 which meets the guidelines based on the husband's net income of $672.00 approximately and the wife's net income of $574.00 approximately.
12. The husband shall provide health insurance for the benefit of the minor children. All uninsured medical and dental bills will be shared equally by the husband and wife.
13. The husband shall maintain life insurance on his life in the principal sum of $100,000.00 naming the wife the beneficiary of same so long as there is a duty to support.
14. The husband shall maintain life insurance on his life naming each child the beneficiary of $35,000.00 so long as there is a duty to support the child.
15. Although the wife's attorney's fees are found to be reasonable, the husband does not have the financial ability CT Page 1403 to make a contribution to them based on this court's orders.
EDWARD R. KARAZIN, JR., JUDGE